

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,082

### ALI AWAD MAHMOUD IRSAN, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 1465609
### IN THE 184TH JUDICIAL DISTRICT COURT
### HARRIS COUNTY

**WALKER, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

In July 2018, a Harris County jury convicted Appellant of capital murder for killing Gelareh Bagherzadeh and Coty Beavers during different criminal transactions but pursuant to the same scheme or course of conduct. *See* TEX. PENAL CODE Ann. § 19.03(a)(7)(B). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. Ann. art. 37.071, § 2(g). Direct appeal to this Court is automatic. *Id.* § 2(h).

Appellant raises thirty points of error. Finding no reversible error, we will affirm the trial

court's judgment of conviction and sentence of death.

## I — Background

In order to shed light on the State's theory of how these murders fell within "the same scheme or course of conduct," *see* TEX. PENAL CODE Ann. § 19.03(a)(7)(B), we begin by laying out some of Appellant's biographical information. Although Appellant does not challenge the sufficiency of the evidence to support his capital murder conviction or death sentence, many of his points of error will be easier to understand with this background in place.

Appellant was born in the Middle Eastern country of Jordan in 1957. He came to the United States as a student in 1979, married United States citizen Robin Jacobs in 1980, and became a naturalized United States citizen in 1986. Appellant and Jacobs had four daughters: Nasemah, Nadia, Nesreen, and Nada. Much of this case revolves around Appellant's turbulent relationship with his third daughter, Nesreen.

In 1992, during an extended stay in Jordan, Appellant took a second wife, a fifteen-year-old Jordanian girl named Shmou Alrawbdeh. At the time, Appellant was still married to Jacobs. Although Appellant's marriage to Alrawbdeh would have been illegal in the United States, it was legal in Jordan. After marrying Alrawbdeh, Appellant remained in Jordan for around seven months, during which time he impregnated Alrawbdeh with their first child, Nasim. Appellant returned to the United States in the middle of 1993.

Alrawbdeh joined Appellant in 1995, when she moved into the Conroe, Texas house Appellant shared with Jacobs, Nasemah, Nadia, Nesreen, and Nada. Jacobs ultimately left Appellant, never to return, a few months after Alrawbdeh arrived. Alrawbdeh and Appellant had seven more

children between 1996 and 2011.[1]

When Appellant immigrated to the United States, he brought with him certain beliefs, evidently commonplace in Jordan but unorthodox to the American way of thinking. Specifically, Appellant believed that if a young woman married a man of her choosing rather than a man of her family's choosing, she would bring tremendous shame, embarrassment, and dishonor upon her family and her father in particular. Appellant also believed that a father so dishonored could "clean" his honor by killing the offending daughter and the man she wanted to marry. In the years leading up to the instant murders, Appellant openly and forcefully defended such "honor killings" in front of his family and neighbors. For instance, Appellant told his daughters that if one of them married anyone other than a Sunni Muslim Jordanian of his choosing, he would "put a bullet between" her eyes and the eyes of the man she wanted to marry. This brings us to the discord between Appellant and Nesreen.

In 2009, while attending Lone Star College in Montgomery County, Nesreen fell in love with a white, Christian man named Coty Beavers. Coty fell for her, too. Because of Appellant's outspoken beliefs about "honor," Coty and Nesreen did not go on "normal dates, like out to dinner or to the movies." Even so, and despite the need for secrecy, Coty and Nesreen were happy together—especially Nesreen, who would "light up" whenever she saw Coty.

Coty and Nesreen hid their relationship from Appellant and Alrawbdeh for nearly two years.

---

[1] The first of the two murders in this case happened in January 2012, meaning anyone born after January 1994 would have been under the age of eighteen when Appellant initiated the instant capital murder scheme. Under the Texas Rules of Appellate Procedure, "the name of any person who was a minor at the time the offense was committed" constitutes sensitive data. TEX. R. APP. P. 9.10(a)(3). In an abundance of caution, we have assigned pseudonymous initials (A.I., B.I., C.I., and so on) to Appellant's children born after January 1994.

In June 2011, while Appellant was on a trip to Jordan, Alrawbdeh looked through Nesreen's phone and discovered two voice messages from Coty. Though Alrawbdeh did not know who Coty was at the time, the messages confirmed that Nesreen was in a romantic relationship that her father did not authorize. When Nesreen discovered that Alrawbdeh had looked through her phone, she decided to leave home before Appellant returned from Jordan. Before Appellant returned from his trip, Nesreen moved out of Appellant's house. She moved into the house Coty shared with his twin brother, Cory, and their mother, Shirley McCormick.

When Appellant returned from Jordan, Alrawbdeh told him about the voice messages on Nesreen's phone. Nadia knew where Coty lived and informed Appellant and Alrawbdeh where Nesreen was likely to be found. Appellant immediately drove to McCormick's house to find Nesreen and make her come home. After he failed on both objectives, he embarked on what the State describes in its brief as an "extraordinary campaign of stalking and harassing Nesreen and Shirley and her family." Over the next several weeks, Appellant stalked McCormick's neighborhood day and night; vandalized Coty's, Cory's, and McCormick's cars; tried to have Nesreen arrested on spurious accusations; and began meticulously tracking license-plate numbers and the comings-and-goings from McCormick's house.

Undeterred by Appellant's attempts to intimidate them, Coty and Nesreen married in July 2011. The same month, Nesreen obtained a protective order against Appellant. Among other things, the order prohibited Appellant from "[c]ommunicating directly with NESREEN IRSAN in any manner," "coming within 500 feet of [Nesreen's] place of residence," and "[p]ossessing a firearm." Appellant eventually violated each of these terms. For instance, he bought a .22-caliber handgun and two .380-caliber handguns from a neighborhood acquaintance, paying for the firearms with

prescription painkillers. Appellant also started bringing masks and gloves on his surveillance trips to McCormick's neighborhood. He then devised a plan to invade McCormick's house in the dead of night, aided by his son Nasim, so that the pair could systematically track down and kill Nesreen, Coty, Cory, and McCormick. Appellant believed that these killings would "clean" the stain on his "honor" that, in his mind, Nesreen and her new family had inflicted. Late one night, Appellant and Nasim traveled to McCormick's house and approached the residence armed with guns, gloves, and masks. However, Appellant aborted the plan at the last minute, describing it as "near impossible."

Around this time, Cory began dating Gelareh Bagherzadeh, an Iranian woman whom Nesreen knew from school. As Cory and Bagherzadeh's relationship blossomed, she began to spend more time at McCormick's house. As a result, Bagherzadeh and Nesreen became close friends. Being a convert from Islam to Christianity, Bagherzadeh gave Nesreen advice and encouragement as Nesreen left her father's religion behind and converted to Christianity. Bagherzadeh was "proud" and "supportive" of Nesreen as she "emancipated [her]self" from Appellant.

Appellant eventually learned about Bagherzadeh's friendship with, and influence on, Nesreen. At one point in the fall of 2011, Appellant used Nadia's phone to speak to Bagherzadeh and angrily called her an "Iranian bitch." After this exchange, Appellant added Bagherzadeh to the list of people he wanted to kill.

On the evening of January 15, 2012, Appellant drove himself, Alrawbdeh, and Nasim to McCormick's house, bringing gloves, masks, guns, and a cord (described as "one of the laces that come off the hoodie of a sweat jacket"). When Appellant saw Bagherzadeh's car parked in front of McCormick's house, he told his wife and son, "I guess today's her day." Appellant and his companions waited outside McCormick's house until they saw Bagherzadeh leave the house and get

into her car. They then followed her for a while before preemptively traveling to the townhouse complex in Houston where she lived. Having previously stalked Bagherzadeh's family online and tailed her vehicle on "three or four" occasions, Appellant knew her home address. The trio drove to a parking area in her townhouse complex and waited for her to arrive. Eventually, she did.

When Bagherzadeh parked, but did not exit the car, Appellant moved his vehicle directly behind hers. He then exited his vehicle, hoping to get her to lower her window so that he could slip the cord around her neck and strangle her with it. But when Appellant knocked on her window, she did not roll it down; instead, she started to drive off. At that point, Nasim exited Appellant's vehicle with a .38-caliber firearm, walked to the passenger side of Bagherzadeh's car, got "very close" to the car, and shot her in the head through the passenger's side window, killing her.

Appellant and Nasim got back into Appellant's car, and Appellant praised Nasim, saying, "That's [my] man." The following morning, when they were back home, Appellant and Alrawbdeh watched a news story about Bagherzadeh's murder on television. Appellant gave Alrawbdeh a "thumb[s] up" and said, "One is gone and the rest to go." In August 2012, Appellant called Nesreen from a payphone and said, "The bitch was first, then you're going to be next, nobody dishonors me and gets away with it."

Coty and Nesreen eventually decided to move out of McCormick's house and into an apartment of their own. In October 2012, the couple relocated to an apartment in northwest Houston. Initially, the only person who knew the address of their new apartment was McCormick.

But Appellant had continued his surveillance on McCormick's house, and one day, he spotted Coty and Nesreen loading their belongings into a car. When they finished loading the car, the couple drove to their new apartment. Appellant followed them, found out where they lived, and from then

on, focused his attention on Coty and Nesreen's apartment. Appellant memorized the couple's daily routine.

In the early morning hours of November 12, 2012, Appellant, accompanied by Alrawbdeh and Nasim, drove to the parking lot of Coty and Nesreen's apartment complex and set up surveillance. The trio watched as Coty walked Nesreen to her car to see her off for the day, as was the couple's morning routine. As Coty kissed Nesreen goodbye, Appellant and Nasim snuck over to the building and slipped inside the couple's apartment. Nesreen then drove Coty back to the building; he kissed her again and told her he loved her one last time. When Coty returned to the apartment, Appellant and Nasim were waiting for him. Appellant shot Coty multiple times with a .22-caliber firearm, killing him.

After a lengthy investigation by a state and federal law enforcement task force, Appellant was arrested in May 2014 on suspicion of murdering Bagherzadeh and Coty. The State ultimately tried Appellant for capital murder on the theory that he had "murder[ed] more than one person . . . during different criminal transactions but . . . pursuant to the same scheme or course of conduct." *See* TEX. PENAL CODE Ann. § 19.03(a)(7)(B). The jury found Appellant guilty of capital murder as alleged in the indictment and answered the punishment phase special issues in favor of the death penalty.[2]

## II — Points of Error One and Two

In his first two points of error, Appellant accuses the trial court (point of error one) and "prosecution team" (point of error two) of "acquiesc[ing] in defense counsel's race-based exclusion

---

[2] Court records also show that Nasim pleaded guilty to murder in August 2019, in exchange for a forty-year prison sentence. In November 2021, Nadia pleaded guilty to engaging in organized criminal activity in exchange for a ten-year term of deferred adjudication community supervision. In February 2022, Alrawbdeh pleaded guilty to murder in exchange for an eight-year prison sentence.

of" a prospective juror. Appellant contends that this acquiescence violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

At the general qualification, "group" stage of jury selection, the trial judge invited the veniremembers to assert any jury service excuses they thought might apply to them. Veniremember 467 suggested that serving as a juror in this case might pose a financial hardship, but she was noncommittal. Despite the veniremember's reservations, the trial judge had her complete a questionnaire. After Veniremember 467 completed her questionnaire but before individual voir dire, the parties mutually agreed to excuse her. *See* TEX. CODE CRIM. PROC. Ann. art. 35.05 ("One summoned upon a special venire may by consent of both parties be excused from attendance by the court at any time before he is impaneled.").

A few days later, the trial judge called Veniremember 467 on the phone to tell her that she "[didn't] have to come" to court because the parties had agreed to excuse her. But when she indicated that she "was really interested in" jury service and might be able to work something out with her employer, the trial judge asked the parties (who were present for the call), "Are y'all still okay with excusing her?" The State responded, "Yes, ma'am." Defense counsel responded, "after reviewing her questionnaire again, we'll agree if the State wants to agree." The trial judge excused Veniremember 467 and ended the call.

The following exchange then took place:

[Defense Counsel]:   Also for the record, Judge, she is a black female.

THE COURT:   I don't think so. Was she?

[Defense Counsel]:   She's a black female. And knowing what the evidence could -- could come out in evidence is a possible -- is a reason -- another reason I take into consideration in our decision to

agree to her.

THE COURT: Are some of the victims black females?

[Defense Counsel]: No, ma'am. There are other issues.

THE COURT: Other issues? Okay. Well, I don't know what those are, but if it's important to you, I imagine there's a good reason.

The trial judge and parties then spoke with the next prospective juror; Veniremember 467 was not discussed again.

On appeal, Appellant argues that once the trial judge and prosecutor learned that defense counsel had considered Veniremember 467's race in agreeing to excuse her, they were constitutionally "obliged to repudiate—and thwart—defense counsel's racially-motivated action." He primarily discusses the United States Supreme Court cases of *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that the Equal Protection Clause prohibits the prosecution from exercising peremptory strikes on the basis of race), and *Georgia v. McCollum*, 505 U.S. 42, 59 (1992) (holding that the Equal Protection Clause prohibits criminal defendants from exercising peremptory strikes on the basis of race).

At the outset, we question the applicability of *Batson* and *McCollum* to these points of error. Those cases speak to the impropriety of race-based peremptory strikes, but here, both parties agreed to excuse Veniremember 467, while only one party referenced the veniremember's race. That said, to the extent the *Batson* framework does inform the proper resolution of these points of error (and to the extent Appellant seeks to invoke that framework), we hold that Appellant's arguments are procedurally defaulted.

"*Batson* error," we have said, "is subject to principles of ordinary procedural default." *Batiste*

*v. State*, 888 S.W.2d 9, 17 n.5 (Tex. Crim. App. 1994). If a defendant does not object to what he believes to be race-based peremptory strikes, he forfeits his opportunity for a hearing in which the State can offer race-neutral explanations to any prima facie case of purposeful discrimination. *See id.* It follows that a trial court has no *sua sponte* duty to initiate the *Batson* protocol by demanding race-neutral explanations for the State's peremptory strikes. *Cf. Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004) ("A law that puts a duty on the trial court to act *sua sponte*, creates a right that is waivable only. It cannot be a law that is forfeitable by a party's inaction.").[3]

Appellant has not satisfactorily explained why, even though a trial court has no *sua sponte* duty to demand race-neutral explanations from the State, it nevertheless has (or should have) a *sua sponte* duty to demand race-neutral explanations from the defense. He suggests that such a duty might arise when it becomes "apparent" that the defense is engaging in racial discrimination. But under ordinary rules of procedural default, the egregiousness of an alleged error does not transform a forfeitable claim into one that is immune from procedural default. *See Proenza v. State*, 541 S.W.3d 786, 796 (Tex. Crim. App. 2017) ("[A] proper determination of a claim's availability on appeal should not involve peering behind the procedural-default curtain to look at the particular circumstances of the claim within the case at hand.") (internal quotation marks omitted). Neither we nor the Supreme Court have ever held that some *Batson* or *McCollum* violations are so egregious (or "apparent") that the trial court must, on its own initiative, intervene. *See McCollum*, 505 U.S. at 59 ("*if the State demonstrates a prima facie case of racial discrimination* by the defendants, the

---

[3] *See also Falk v. State*, No. AP-77,071, 2021 WL 2008967, at *14 (Tex. Crim. App. May 19, 2021) (per curiam, not designated for publication) ("when a defendant does not raise a *Batson* objection at trial, the trial court has no *sua sponte* duty to demand race- or gender-neutral explanations for the State's peremptory strikes.").

defendants must articulate a racially neutral explanation for peremptory challenges.") (emphasis added).[4]

That said, at times, Appellant's argument goes beyond the traditional *Batson* framework. For instance, Appellant discusses a Fifth Circuit case in which the prosecution and defense mutually agreed to exclude all of the black veniremembers from the panel, and "[t]he trial court permitted this to happen without requesting a non-discriminatory explanation or even requiring the parties to expend a single peremptory challenge." *Mata v. Johnson*, 99 F.3d 1261, 1264 (5th Cir. 1996), *vacated in part by* 105 F.3d 209, 210 (5th Cir. 1997) (op on reh'g). The *Mata* court acknowledged that it could not "apply the traditional *Batson* framework to Mata's claim because no objection was made at trial." *Id.* at 1270. Even so, the court held that the agreement violated the Equal Protection Clause because "it would be ludicrous to believe that state actors could avoid the constitutional infirmity of race-based peremptory strikes by mutual agreement." *Id.* at 1269.

But this case is nothing like *Mata*. The record does not reveal why the State agreed to excuse Veniremember 467, nor why the trial judge saw fit to enforce the agreement. And there is simply no reason, on this record, to attribute to the trial judge or the State the kind of attentiveness to race that defense counsel displayed. Indeed, the record suggests that the trial judge did not even realize that Veniremember 467 was (in defense counsel's words) a "black female." Because there is no indication that the trial judge or prosecutors in this case were attempting to "avoid the constitutional infirmity of race-based peremptory strikes by mutual agreement," the record does not support a *Mata*-like equal protection violation. *See id.* Points of error one and two are overruled.

### III — Points of Error Three Through Six

---

[4] *See also Falk*, No. AP-77,071, 2021 WL 2008967, at *15 (rejecting similar argument).

In points of error three through six, Appellant alleges that his trial was plagued by "Islamophobic, racial, and ethnic stereotypes." He argues that these stereotypes offended the Eighth Amendment's protection against cruel and unusual punishments (point of error three); the Fourteenth Amendment's guarantees of equal protection (point of error four) and due process (point of error five); and Article 37.071, Section 2(a)(2) (point of error six).

Although these points of error invoke different legal bases, they generally complain about the same occurrences at trial. According to Appellant, the State injected impermissible stereotypes into the trial by: (1) seeking the death penalty against him because of his "cultural beliefs"; (2) "repeatedly tapp[ing] directly into a deep well of anti-Muslim, anti-Middle Eastern immigrant antipathy that was rampant at the time of trial"; and (3) making inflammatory remarks about his religion and nationality in its guilt and punishment phase jury arguments. We address these contentions item-by-item.

First, Appellant alleges that the State sought the death penalty against him because of his "cultural beliefs." He points to an exchange that occurred at a pretrial hearing on his "Motion to Quash the Indictment." The motion alleged that the phrase "same scheme or course of conduct," as used in the indictment and Penal Code Section 19.03(a)(7), failed to provide Appellant with enough notice to prepare a defense. The trial judge declined to quash the indictment but otherwise agreed with Appellant that he was entitled to "some notice about how [the State] intend[ed] to link these two [murders] together." When the trial judge directed the State to provide the defense with additional notice, the following exchange took place:

> [Prosecutor]: I mean, I think basically it is Mr. Irsan culturally had beliefs held about how people should behave and what is considered respect and disrespect. And I believe that he was angered by his daughter's

> actions and engaged in a scheme or course of conduct to avenge the disrespect. I mean, it goes in line with the hit list that he had, the people that he wanted to take out, that it was in the same course of conduct.

THE COURT:    Okay. Well, that should help you.

[Defense Counsel]:    That helps some.

Appellant did not object to the prosecutor's "cultural beliefs" remark.

To the extent Appellant suggests that this exchange shows that the State sought the death penalty against him because of his cultural beliefs, he misrepresents the record. In the above exchange, the State did not explain its reason for seeking the death penalty against Appellant. It articulated its account of how the murders of Bagherzadeh and Coty, though occurring in different criminal transactions, were nevertheless "committed pursuant to the same scheme or course of conduct." *See* TEX. PENAL CODE Ann. § 19.03(a)(7)(B). In other words, the exchange above reflected the State's theory of capital murder, not its reason for seeking the death penalty.

If Appellant believed that the prosecutor's "cultural beliefs" remark supported a claim of selective or discriminatory prosecution, it was incumbent on him to state the basis for his claim, ask for a remedy, and obtain a ruling. *See generally* TEX. R. APP. P. 33.1(a). Appellant filed a pretrial motion to preclude the State from seeking the death penalty in which he argued that: (A) it would be impossible to "impanel a fair and impartial jury in the current Islamophobic climate which exists in Texas, and nationwide"; and (B) "the first special punishment issue, regarding the defendant's future dangerousness, provides opportunity for racial consideration against Muslims to influence the jury's sentencing decision." He obtained an adverse ruling on this motion, reurged it after the prosecutor's "cultural beliefs" remark, and obtained another adverse ruling. But the motion itself

bore the hallmarks of a motion for change of venue, not a claim of selective prosecution. And neither in the motion nor in the reurging did Appellant allege that the State's motivations for prosecuting Appellant or seeking the death penalty against him were somehow improper. Where, as here, no effort was made at trial "to establish the alleged discriminatory prosecution[,] . . . nothing is presented for review." *Gawlik v. State*, 608 S.W.2d 671, 673 (Tex. Crim. App. [Panel Op.] 1980).

Second, Appellant claims that the State "repeatedly tapped into a deep well of anti-Muslim, anti-Middle Eastern immigrant antipathy that was rampant at the time of trial." Here, he directs our attention to the fact recitation portion of his brief, which in turn highlights the following exchanges at trial:

- One of the State's witnesses described a woman that the witness thought was Appellant's wife as wearing "one of them dresses with the little towel deals on her head."

- Another State's witness testified that he initially believed the FBI took an interest in Appellant's activities "because, you know[,] . . . he's Muslim."

- While questioning another witness about Appellant's citizenship status, the State asked the witness to explain the phrase "anchor baby," and referenced "the Mafia" in another question about Jordanian culture.

- When cross-examining Appellant's son, D.I., the State inquired whether Appellant's daughters always "wore the hijab when they left the home."

- The State asked Appellant's son, C.I., whether he had previously become angry at his sister, B.I., "because she was talking to a white Christian boy."

- The State asked Appellant to concede from the witness stand that "in the United States of America we don't follow Jordanian law," and that United States law does not permit polygamy. The State also asked Appellant whether "Iran is typically a conservative Muslim country," and when Appellant (who is not Iranian) claimed ignorance, the State expressed skepticism, stating, "Sir, you are from the Middle East. Are you telling me you don't know anything about Iran?"

- At punishment, the State asked Appellant's sister a series of questions about "an Islamic saying called al taqiyya," which the State framed as "something in your culture that allows you to lie when it is in your interest to do so."

But at trial, Appellant did not object to any of these exchanges as examples of "anti-Muslim, anti-Middle Eastern immigrant antipathy." *See* TEX. R. APP. P. 33.1(a).[5] "We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence." *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002). This is true even though the evidence might implicate the defendant's constitutional rights. *Id.* As relevant here, a defendant's failure to object to testimony prevents his raising on appeal a claim that the State offered evidence designed to stoke impermissible prejudices. *See id.* ("a defendant's failure to object to testimony prevents his raising on appeal a claim that the testimony was offered for the sole purpose of appealing to the potential racial prejudices of the jury.").[6]

Third, Appellant argues that the State evoked impermissible stereotypes in the following guilt and punishment phase jury arguments:

- In its guilt phase opening statement, the State referenced: (A) Appellant's "extremist views" and beliefs; (B) his Jordanian nationality; (C) some differences between American and Jordanian cultures; and (D) the fact that

---

[5] In his brief, Appellant says that the instances listed above are a "representative sample," not an "exhaustive catalogue," of the State's efforts to inject Islamophobia and anti-Middle Eastern sentiments into the trial. To the extent Appellant seeks to marshal other unidentified trial occurrences in support of these points of error, his claim is inadequately briefed. *See* TEX. R. APP. P. 38.1(I) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). We will not make Appellant's argument for him. *See Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995) ("we will not brief appellant's case for him.").

[6] *Cf. Batiste v. State*, No. AP- 76,600, 2013 WL 2424134, at *5 (Tex. Crim. App. Jun. 5, 2013) (not designated for publication) (the appellant procedurally defaulted his claim that the admission into evidence of a "Santa Muerte" necklace violated his right to the free exercise of religion).

"women are treated very differently there."

- In its guilt phase closing argument, the State: (A) labeled Appellant a "radical extremist Muslim"; (B) referred to "the tribal culture in Jordan"; and (C) highlighted testimony that in some Middle Eastern countries "Muslim girls do not marry Christian men" because "[i]t brings [dis]honor and shame to the family."

- In its punishment phase closing argument, the State: (A) told the jury that Appellant's "radical extremist views . . . should scare you"; (B) referenced the "American Christian young men" Appellant's daughters were dating; (C) stated, "In Jordan, the remedy for raping a woman is you get to marry [her]"; and (D) suggested that the jury's verdict would send a message to Appellant, "those who are like him," and "his family, both here . . . and in Jordan."

But here again, Appellant did not object to these arguments as examples of Islamophobia and anti-Middle-Eastern bigotry. Accordingly, Appellant forfeited his complaints about the State's jury arguments. *See Compton v. State*, 666 S.W.3d 685, 727–30 (Tex. Crim. App. 2023) (by failing to object at trial, the appellant procedurally defaulted his claims that the State's jury arguments violated his constitutional rights to equal protection and due process, the Eighth Amendment, the constitutional prohibition on prosecutorial misconduct, and Article 37.071, Section 2(a)(2)); *see also Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) ("a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal."); *Banda v. State*, 890 S.W.2d 42, 61 (Tex. Crim. App. 1994) (although appellant "specifically complain[ed] that the prosecutor misstated the law, argued matters outside the record, and repeatedly attempted to inflame the jury during closing arguments[,] Appellant did not object at trial to any of the actions he complains of on appeal. He has failed to preserve error.").

In a series of footnotes, Appellant argues that these claims are not subject to procedural

default—and that if they are subject to procedural default, we should reach them all the same "in the interest of justice." But we have rejected these kinds of arguments before, and we are no more persuaded by them now. *See, e.g.*, *Compton*, 666 S.W.3d at 727–30; *Saldano*, 70 S.W.3d at 886–89. Points of error three through six are overruled.

## IV — Points of Error Seven and Eight

Next, Appellant contends that the trial judge violated his constitutional right to the presumption of innocence (point of error seven) and the statutory prohibition on improper judicial commentary (point of error eight) when the judge suggested during voir dire that law enforcement had already "solved" the case.

While admonishing one of the venire panels not to conduct any independent research about Appellant's case, the trial judge said:

> I know at least one TV station ran a news story on this case. When we began jury selection, there was something in the Chronicle. At one time, there was quite a bit of publicity about the case. The case was unsolved for a couple of years. *And then when it was solved, there was more publicity about it.*

(Emphasis added).

After the trial judge released the panel from the courtroom for the venirepersons to complete their questionnaires, defense counsel objected to the suggestion that Appellant's case had already been "solved." Appellant first identified on the record the twenty veniremembers who heard the trial judge's comment. He then argued:

> [Defense Counsel]:  . . . our position is that it was a comment on the evidence by the Court. We ask that these jurors be struck and not be part of the jury.
>
> THE COURT:  Well, I regret I said that. I'm sorry. I didn't even notice it when I said it. I was just in a hurry to get them out of here, but

tomorrow I will -- I don't want to draw attention to it by commenting on it, but I think by the time we discuss the law, they're going to know that it's up to them whether or not it was solved. So I think that -- I think they will figure it out after I talk to them tomorrow. So sorry. I will be more careful [with] that.

You are asking for the panel be quashed or what?

[Defense Counsel]:    This whole group, this panel be quashed and not be brought back for questioning as potential jurors.

THE COURT:    That's denied.

The following day, on the parties' agreement, the trial judge excused five of the "case-solved" veniremembers (652, 658, 684, 687, 706). The trial judge then addressed a large panel of veniremembers, including the remaining fifteen "case-solved" veniremembers, to prepare them for individual voir dire. In the course of these preparatory remarks, another two of the remaining "case-solved" veniremembers (709, 710) were excused when they admitted that they had been exposed to prejudicial pretrial publicity about Appellant's case. Yet another two (649, 675) were excused for reasons related to their work schedules.

The trial judge's preparatory remarks included the following explanation of the presumption of innocence:

Of course, the defendant gets the presumption of innocence. Very, very important in the law. And I know we've all heard that since we were kids, innocent until proven guilty. It's very important in the criminal justice system. It's the cornerstone of our system. Obviously, you have not heard any evidence yet, so the defendant is innocent. You should be able to give him the important presumption of innocence.

So I'm going to move over. Mr. Irsan, will you stand, please, sir?

(Defendant complies)

THE COURT:     I want everybody to look at Mr. Irsan. You should see him now as an innocent person.

Thank you. You may have a seat, sir.

Is there anyone who could not give Mr. Irsan that all-important presumption of innocence?

Only one veniremember—who was not part of the "case-solved" panel—stated that he could not presume Appellant to be innocent.

The remaining eleven "case-solved" veniremembers (each of whom affirmed by their silence during the above exchange that they could presume Appellant to be innocent) went through individual voir dire. Appellant did not ask any of these veniremembers about the trial judge's "case-solved" remark. Nor did he seek to clarify or refute the remark. Appellant challenged one veniremember (657) for cause on the ground that he was part of the "case-solved" panel. But when the trial judge (without ruling on Appellant's for-cause challenge) offered to "straighten it out," Appellant assented. Describing her remark as "something I shouldn't have said" and a "problem," and explaining that "[s]ometimes judges make mistakes," the trial judge reiterated the importance of the presumption of innocence. The trial court emphasized to Veniremember 657 that, "You are the one who decides if [the case] was solved correctly, not me." The trial judge then asked Veniremember 657 if he could "disregard what [the judge had] said about the case being solved"; the veniremember assured the trial judge that he could. Appellant did not object to the trial judge's follow-up remarks and did not reurge his challenge for cause. He later exercised a peremptory strike on Veniremember 657.

Of the ten other "case-solved" veniremembers who went through individual voir dire, one (647) was excused by agreement, and the State successfully for-cause challenged another two (690,

699). The State peremptorily struck one "case-solved" veniremember (685), Appellant peremptorily struck another two (674, 688), and yet another three (700, 701, 702) were not reached in the jury-selection process. Ultimately, of the twenty veniremembers who heard the trial judge's "case-solved" comment, only one (692) served on Appellant's petit jury.

We begin with Appellant's statutory complaint. Article 38.05 forbids a trial judge from making, "at any stage of the proceeding previous to the return of the verdict, . . . any remark calculated to convey to the jury his opinion of the case." TEX. CODE CRIM. PROC. Ann. art. 38.05. We have held that a party may assert an Article 38.05 violation for the first time on appeal. *Proenza*, 541 S.W.3d at 801. To establish that a trial judge violated Article 38.05, the claimant must show that the judge made a remark in front of the jury that was "'reasonably calculated to benefit the State or prejudice the defendant's rights.'" *Id.* at 791 (quoting *McClory v. State*, 510 S.W.2d 932, 934 (Tex. Crim. App. 1974)). Further, to obtain a reversal on an Article 38.05 violation, the claimant must show that the violation was harmful, that is, he must show that it affected his "substantial rights." *See id.* at 801; TEX. R. APP. P. 44.2(b).

Assuming without deciding that the trial judge's comment in this case ran afoul of Article 38.05, we conclude that it did not result in reversible harm. In general voir dire, after the "case-solved" remark, the trial judge spoke at length about the importance of the presumption of innocence, describing it as "the cornerstone of our system." Further, none of the "case-solved" veniremembers spoke up when the trial judge asked whether there was "anyone [on the panel] who could not give Mr. Irsan that all-important presumption of innocence." Appellant later used peremptory strikes against three of the "case-solved" veniremembers, but in individual voir dire, all three swore that they could follow the law on the presumption of innocence. And while one of the

"case-solved" veniremembers ultimately served on Appellant's petit jury, the juror's questionnaire reflected that she "[s]trongly agree[d]" with the statement, "A defendant is innocent until proven guilty beyond a reasonable doubt." Notably, the "case-solved" veniremembers completed their questionnaires after the trial judge made the comment in question. All in all, the record does not show that the trial judge's off-the-cuff remark affected Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b).

That brings us to Appellant's constitutional complaint. The United States Constitution prohibits a trial judge from making a comment in front of the jury that "effectively destroy[s] a defendant's constitutional presumption of innocence." *See, e.g.*, *United States v. Haywood*, 411 F.2d 555, 555 (5th Cir. 1969) (per curiam) (holding that informing the defendant of his right to allocution before the case had been submitted to the jury for decision destroyed the defendant's constitutional presumption of innocence). However, we have never authoritatively decided whether a litigant may raise a constitutional complaint about an improper judicial remark if he did not complain about the remark on this basis at trial. *Compare Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013) ("Ordinarily, a complaint regarding an improper judicial comment must be preserved at trial."), *with Proenza*, 541 S.W.3d at 802 ("claims brought *under Article 38.05* are not . . . subject to forfeiture by inaction.") (emphasis added).

In this case, Appellant did not object that the trial judge's remark weakened or "destroy[ed]" the presumption of innocence—he objected that the remark constituted a "comment on the evidence by the Court." In an abundance of caution, and given the unsettled state of the law in this area, we will assume without deciding that Appellant is entitled to appellate review of his constitutional complaint. *Cf. Blue v. State*, 41 S.W.3d 129, 132 (Tex. Crim. App. 2000) (plurality op.) ("The

comments of the trial judge, which tainted appellant's presumption of innocence in front of the venire, were fundamental error of constitutional dimension and required no objection."), *distinguished by Unkart*, 400 S.W.3d at 101.

For all of the reasons the trial judge's comment cannot be said to have affected Appellant's substantial right to a presumption of innocence, it cannot be said to have "effectively destroyed" that presumption. *See Haywood*, 411 F.2d at 555. The comment was brief, the trial judge later emphasized the importance of the presumption of innocence, and none of the "case-solved" veniremembers spoke up when the trial judge asked whether they "could not give [Appellant] that all-important presumption of innocence." The trial judge's comment, if inartful, did not necessitate dismissing the panel. Appellant has not shown that he is entitled to a reversal on constitutional grounds. Points of error seven and eight are overruled.

## V — Point of Error Nine

In point of error nine, Appellant argues that the trial judge erred when she "admitt[ed] GPS evidence obtained in an unconstitutional search and seizure, violating [Appellant's] Fourth Amendment rights."

On June 5, 2014, a United States Magistrate Judge approved an "Application for a Search Warrant" submitted by Special Agent Gary Dickens of the Social Security Administration, Office of the Inspector General (SSA/OIG), requesting authorization to search Appellant's primary residence. The application included an "Affidavit in Support of Search Warrant." The SSA had received information that Appellant had committed fraud against the United States Government. But the SSA was also working in concert with the task force investigating Appellant for capital murder.

The warrant itself stated:

> I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above [Appellant's homestead], and that such search will reveal (*identify the person or describe the property to be seized*): (See description of property and items subject to search and seizure in the Affidavit in Support of the Search Warrant).

In turn, the affidavit contained a section labeled, "ITEMS TO BE SEIZED." Under that subheading, the affidavit provided, "The items sought constitute fruits, proceeds, evidence, and instrumentalities of violations of the federal felony offenses" of "Conspiracy to Defraud the United States," "Theft of Public Money," "Benefits Fraud," and "Witness tampering."

The "ITEMS TO BE SEIZED" section described the "Documents," "Items of Value," "electronic devices," and other items that might shed light on Appellant's financial dealings. To that end, the application and affidavit expressly requested permission to seize, among other things, "[t]elephones, cell phones, or electronic devices (including electronic address books, such as devices commonly referred to as electronic tablets, electronic organizers, PDA's, I-phones and Blackberry's) *which contain account information and contact information regarding the location or secretion of assets or currency*." (Emphasis added). The affidavit also alleged that Appellant's sons had been seen moving between Appellant's real-estate properties, suggesting that they might be "hid[ing] assets from the social security administration and from law enforcement."

Authorities executed the warrant the same day it was issued. Among other things, they recovered two Global Positioning System (GPS) devices. When federal officials notified state law enforcement that the devices appeared to contain data pertinent to Coty's murder, state law enforcement obtained a follow-up search warrant.[7] Executing that warrant, state officials extracted

---

[7] At trial, Appellant challenged this follow-up warrant under a "fruit of the poisonous tree" theory. He does not reassert that challenge on appeal.

data from the devices showing, among other things, that Appellant's vehicle was at Coty and Nesreen's apartment on the morning of Coty's murder.

On appeal, Appellant argues that the authorities executing the Warrant violated the Fourth Amendment when, relying on a search warrant authorizing them to seize electronic devices containing "account . . . and contact information," they seized GPS devices containing only "location" information. Appellant advanced this theory of inadmissibility via a pretrial motion to suppress, which the trial judge denied. Then as now, Appellant invokes the Fourth Amendment's "particularity" requirement: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized*." U.S. CONST. amend. IV (emphasis added). Under this provision, the "general Fourth Amendment rule is that the police cannot seize property that is not particularly described in a search warrant." *State v. Powell*, 306 S.W.3d 761, 766 (Tex. Crim. App. 2010).

Appellant takes the position that "the GPS devices . . . were not described as items to be seized in the June search warrant affidavit." We are not persuaded. In our view, the trial judge did not abuse her discretion to find that the GPS devices were reasonably within the scope of the search warrant's description of "ITEMS TO BE SEIZED." *See Crain v. State*, 315 S.W.3d 43, 48 (Tex. Crim. App. 2010) ("A trial court's ruling on a motion to suppress is reviewed on appeal for abuse of discretion.").

Officers executing search warrants are often required to interpret those warrants. *United States v. Stiver*, 9 F.3d 298, 302 (3rd Cir. 1993). Officers are therefore commonly expected to make on-the-fly decisions about a search warrant's meaning and scope. In so doing, an officer need not construe a search warrant as narrowly as possible. *Id.* Instead, the officer may interpret the warrant

reasonably. *See Powell*, 306 S.W.3d at 768–69; *see also* GEORGE E. DIX & JOHN M. SCHMOLESKY, 40 TEXAS PRACTICE, CRIMINAL PRACTICE AND PROCEDURE, § 9:89 (3d ed.) ("Seizure of an item is reasonable if the officer reasonably believed it an item within the scope of the warrant's authorization."). This is especially true in cases like this, where the warrant expressly (and only) authorized officers to seize the "property and items subject to search and seizure in the Affidavit in Support of the Search Warrant." *Cf. Powell*, 306 S.W.3d at 768–69 (analyzing a warrant authorizing the police to seize "the property described in the affidavit"). After all, search warrant affidavits are to be read "in a commonsensical and realistic manner," not "with hyper-technical exactitude." *Foreman v. State*, 613 S.W.3d 160, 163–64 (Tex. Crim. App. 2020).

To be sure, in this context no less than any other, "[t]here are limits to interpretation." *See Hessel v. O'Hearn*, 977 F.2d 299, 302 (7th Cir. 1992). Warrants are not "blank check[s]"; if they were, "the constitutional requirement that a search warrant describe with particularity the things to be seized would be a nullity." *Id.* Therefore, officers may not have "flagrant disregard" for a search warrant's plain meaning. *See id.* (such flagrant disregard transforms a warrant into an unconstitutional general warrant). Neither may they take such leeway in interpreting a warrant that they begin seizing "one thing under a warrant describing another," thereby "converting the search . . . into a general search." *See Powell*, 306 S.W.3d at 769.

With these principles in mind, we conclude that the authorities acted within the scope of the warrant when they seized Appellant's GPS devices. The warrant authorized law enforcement officers to seize "electronic devices . . . contain[ing] account information and contact information regarding the location or secretion of assets or currency." Relying on this language, the officers seized electronic devices that were, from their perspective at the time of the search, very likely to "contain

. . . information regarding the location or secretion of assets or currency." Were we to invalidate this seizure on the theory that these devices did not also contain "account . . . and contact information," we would effectively hold the seizing officers to a standard of "hyper-technical exactitude." *See Foreman*, 613 S.W.3d at 164. We would not apply this standard to the judges and magistrates who approve search warrants, *see id.*, and we will not apply it to the officers tasked with executing those warrants.

The record also contains photographs of the GPS devices in question, and based on their outer appearances, it is not immediately apparent that these devices would lack "account information and contact information." Even if that were immediately apparent to the seizing officers, the phrase "contact information" is not one-size-fits-all. Location data, such as that found on a GPS device, can illuminate the businesses, homes, and other places where a person has met with other people. It can thus potentially reveal who a person has contacted or made contact with on a given day or range of days. In that sense, location data can reveal a person's contact information. It may be that, hyper-technically, that is not how the phrase "contact information" is understood in everyday English. But again, hyper-technical arguments will not carry the day here.

Reading the warrant reasonably and the affidavit in a commonsensical and realistic manner, we find no error in the trial judge's decision to deny Appellant's motion to suppress the fruits of this search. Point of error nine is overruled.

## VI — Point of Error Ten

In point of error ten, Appellant argues that the trial court violated his First Amendment rights by "admitting protected and irrelevant evidence about his alleged political beliefs."

Nesreen testified at punishment that, when she was growing up, Appellant often tuned the

television to "Arabic channels" covering, among other things, "war[s] in . . . Middle Eastern countries." When the prosecutor asked Nesreen what her father had taught her about "these things," Nesreen responded, "He said that they're all because of America and America is Jew-lovers and they are the reason for all the killing in the Middle East."

When the prosecutor next asked Nesreen if her father had spoken to her and her siblings about "suicide bombers," Appellant objected "to all of this as a violation of [the] First Amendment, violation of freedom of speech, [and] freedom of religion." The trial judge overruled Appellant's objection.

Nesreen testified that:

A.      [Appellant] called the kids and he told them that if you are asked to be a suicide bomber, what would you do. And they said we wouldn't do it. And he said: No, you will do it. It's an honorable thing. You go straight to heaven for doing it. It's godly.

Q.      And when 9-11 happened -- do you remember that?

A.      Yes, I do.

Q.      Was that on the TV?

A.      Yes.

Q.      What did the defendant say about that?

A.      He said it's what America deserves. He said that -- he was happy about it. He was happy that -- he said: Alhamd, Osama bin Laden (phonetic).

Q.      What is that?

A.      It means God bless Osama bin Laden.

Q.      And when Osama bin Laden was killed?

A.      He was very angry.

On appeal, Appellant contends that these portions of Nesreen's testimony were not "relevant to the issues being decided" in the punishment phase of his trial. He argues that he was "entitled to believe whatever he wanted about the conflicts in the Middle East, 9/11, suicide bombers, and Osama bin Laden, and his abstract beliefs about these matters were entirely irrelevant to a constitutionally appropriate determination of his sentence." So, according to Appellant, the trial judge committed constitutional error when she overruled his objection to Nesreen's testimony.

The First Amendment prevents the State from employing evidence of a defendant's "abstract beliefs," "when those beliefs have no bearing on the issue being tried." *Dawson v. Delaware*, 503 U.S. 159, 168 (1992). And abstract beliefs that "the jury would find . . . morally reprehensible" are not even admissible "as relevant character evidence." *Id.* at 167. But if the evidence goes beyond mere "abstract beliefs" and illuminates the person's "character" and "proclivity to commit future criminal acts," a trial judge may admit the evidence over a First Amendment objection. *See Beham v. State*, 559 S.W.3d 474, 483 (Tex. Crim. App. 2018); *cf. also* TEX. CODE CRIM. PROC. Ann. art. 37.071, § 2(d)(1) (in deliberating the punishment phase special issues, the jury must "consider all [the] evidence . . . including evidence of the defendant's background or character[.]"). A trial judge's decision "to admit or exclude evidence will not be reversed absent an abuse of discretion." *Beham*, 559 S.W.3d at 478. As long as the trial judge's ruling was within the "zone of reasonable disagreement," it will not be disturbed on appeal. *Id.*

With these principles in mind, we agree with Appellant that he is "entitled to believe whatever he wanted" about the subjects covered in Nesreen's punishment phase testimony and that the First Amendment "protects unpopular and disagreeable political beliefs and speech." *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First

Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). But we cannot agree with the conclusion Appellant apparently draws from these premises: that the fact he uttered these statements in front of his children was somehow irrelevant to the issues before his sentencing jury.

The State's case for capital murder hinged on the jury concluding, based on the evidence and beyond a reasonable doubt, that Appellant's beliefs about "honor" were not mere abstractions—that they had spurred him to action, to the point of killing two people and plotting to kill several more. And indeed, the evidence showed that, when Appellant held a belief, he did not necessarily hold it in some theoretical, "abstract" way. *See Dawson*, 503 U.S. at 167. He was willing and able to act on his beliefs by any means necessary, even if it meant recruiting others to help him do so.

Viewed in this light, it was within the zone of reasonable disagreement for the trial judge to conclude that the remarks Nesreen attributed to Appellant were relevant to the future dangerousness special issue. *See* Tex. R. Evid. 401, 402; *see also* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a)(1). If true, the fact that Appellant praised suicide bombing and the September 11, 2001 terrorist attacks would make it incrementally more likely that he would carry out violent acts in or out of prison or direct others to do the same. The facts that Appellant admired bin Laden and was angered by his death make it incrementally more likely that he shared bin Laden's belief system, and would therefore deem it appropriate to act on that belief system. *See Beham*, 559 S.W.3d at 482 (a trial judge might reasonably conclude that "if a person glorifies a certain lifestyle, he is likelier to want to participate in that lifestyle."). A factfinder could rationally find these observations to be true of Appellant, not because of his abstract beliefs, but because of his character as shown by the evidence at trial.

As for Appellant's statement about America being a nation of "Jew-lovers," Appellant's trial-level objection cannot reasonably be read to embrace this statement. Appellant did not object right after Nesreen attributed this statement to him, instead waiting until after Nesreen started testifying about "suicide bombers" to object to "all of this" as a violation of his First Amendment rights. Nor did Appellant ask the trial judge to instruct the jury to disregard the "Jew-lovers" portion of Nesreen's testimony. Although Appellant complains about this aspect of Nesreen's testimony on appeal, he has forfeited his ability to do so. *See Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992) ("[W]hen it seems from context that a party failed effectively to communicate his desire, then reviewing courts should not hesitate to hold that appellate complaints arising from the event have been lost."); TEX. R. APP. P. 33.1(a). Point of error ten is overruled.

### VII — Points of Error Eleven Through Fourteen

In points of error eleven through fourteen, Appellant asserts that, at the guilt phase, the trial judge erroneously permitted the State to introduce evidence of an extraneous murder.

Before trial, the State notified Appellant, "Pursuant to Rules 404(b) and 609 of the Texas Rules of Criminal Evidence and section 37.07 of the Texas Rules of Criminal Procedure," that it intended to offer evidence of certain "Prior Convictions and Extraneous Offenses of this Defendant." Among the "Extraneous Offenses" listed within the State's notice was an allegation that, "On or about September 19, 1999," Appellant "committed the offense of murder, by shooting Amjad Alidam with a deadly weapon, namely a shotgun, and causing the death of Amjad Alidam." The State possessed evidence suggesting that Appellant killed Alidam for marrying Appellant's eldest daughter Nasemah without Appellant's permission—conduct that Appellant took as a slight upon his honor.

On its face, the Alidam killing resembled one of the murders underlying the instant capital murder prosecution: the murder-by-gunshot of Coty, another son-in-law of whom Appellant disapproved. Even so, early in the proceedings, the State announced that it did not intend to introduce evidence of the Alidam killing until the punishment phase. The State therefore claimed to have instructed its witnesses not to "talk about" or even "mention" the Alidam killing in the guilt phase.

At the guilt phase, Harris County Sheriff's Office Sergeant Francisco Garcia testified that, when Coty was killed, he was tasked with informing Coty's mother of her son's death. During Garcia's testimony, the following exchange took place:

Q.      When you advised Ms. McCormick that her son had been murdered, how did she respond?

A.      She was distraught, she began crying and was very upset.

Q.      Okay. And right after you told her and she was very upset and crying, did she say anything to y'all?

[Defense Counsel]:      Excuse me, Sergeant. Objection as to hearsay.

THE COURT:          Overruled.

A.      Yes.

Q.       (by [Prosecutor])      What did she say?

A.      She said that Irsan killed her son.

Q.      Okay. When she said Irsan, did she tell you a first name?

A.      I don't recall.

Q.      Okay. Did she give you any reasons why she would give a particular name that killed her son?

[Defense Counsel]:     Excuse me. Same objection, Your Honor.

THE COURT:          Overruled.

A.      Yes.

Q.       (by [Prosecutor])       What did she say?

A.      She said that he had killed his son-in-law --

[Defense Counsel]:     Excuse me. I'm going to object and –

THE COURT:          Come on up, please.

The trial judge excused the jury and explained that she had ordered the parties to approach the bench to avoid drawing further attention to Garcia's "son-in-law" testimony. At this point in the trial, the jury had not received any evidence having to do with the Alidam killing. The State therefore offered to "use Coty as the son-in-law"—to ask Garcia a series of questions suggesting that Coty was the "son-in-law" just referenced.

Appellant objected "to the question that was [originally] asked and . . . to the answer," bringing up the evidentiary rules against hearsay and "prior bad acts." *See* TEX. R. EVID. 802, 404(b). Appellant also objected to the State's proposed remedy, fearing that even if the State attempted to redirect the jury's attention to Coty, the jury would nevertheless perceive "that something happened in the past with another son-in-law being killed." Appellant therefore asked the trial judge for an instruction to disregard and informed the judge that, when the jury returned, he would ask for a mistrial.

The trial judge overruled Appellant's objections while signaling that some sort of remedy would be appropriate. Ultimately, the trial judge granted Appellant's request for an instruction to disregard. When the jury returned to the courtroom, the trial judge instructed the jury to "disregard

the last answer of this witness and consider it for no purpose whatsoever." Appellant then moved for a mistrial, which the trial judge denied.

Despite the instruction to disregard, the State went forward with its plan to "use Coty as the son-in-law":

Q.  Sergeant, with your -- through your conversation with Ms. McCormick that evening, did you learn, in fact, that Nesreen Irsan was married to her son, Coty Beavers?

A.  Yes.

Q.  And did you become aware that Coty Beavers was, in fact, Ali Irsan's son-in-law?

A.  Yes.

The questioning then moved on to the topic of Coty's autopsy. Garcia did not make another comment that could be construed as a reference to the Alidam killing.

In points of error eleven through thirteen, Appellant asserts that the trial judge erroneously "allow[ed] the State to inject into evidence at the guilt stage that Appellant had killed his son-in-law Amjad Alidam in 1999." He invokes Texas Rules of Evidence 802 (rule against hearsay—point of error eleven), 403 (rule against unfairly prejudicial evidence—point of error twelve), and 404(b) (rule against propensity evidence—point of error thirteen). In point of error fourteen, Appellant argues that the trial judge should have granted his follow-up request for a mistrial.

We begin with points of error eleven through thirteen. For argument's sake, we will assume without deciding that the trial judge erroneously "allow[ed] the State to inject . . . evidence" of the Alidam killing when she overruled Appellant's objections. Even on that assumption, any error here

did not affect his substantial rights.[8] *See* TEX. R. APP. P. 44.2(b).

"Ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer, even one regarding extraneous offenses." *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). Such is the case here. The complained-of testimony was brief, and the State's "use Coty as the son-in-law" strategy was effective to cure its admission. Garcia did not go into details—no dates, no names (other than the family name "Irsan"), no locations, no manners or means, and perhaps most importantly, no information as to how McCormick had come to learn that "Irsan . . . killed his son-in-law." Had the State not followed through with its "use Coty" strategy, the jury would have been left with evidence that McCormick believed Appellant had murdered *another* son-in-law. Garcia's testimony, as it was, prevented the jury from hearing that kind of ultra-inflammatory, highly indelible trial occurrence that a jury could not be trusted to set aside.

This reasoning also resolves point of error fourteen. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) ("the question of whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis."). As we reiterated in *Simpson*:

> A trial court's denial of a motion for mistrial is reviewed under an abuse of discretion standard. Mistrial is appropriate for only "highly prejudicial and incurable errors."

---

[8] Appellant's trial objections cannot reasonably be read to incorporate Rule of Evidence 403. Appellant has therefore forfeited his ability to invoke Rule 403 on appeal. *See Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial."). Additionally, to the extent Appellant suggests that the trial judge erred to allow the State to proceed with its "use Coty as the son-in-law" strategy, he has not preserved error. Appellant objected when the State proposed that strategy, but the tenor of his objection was that the State's proposal did not go far enough—not that implementing it would violate the Rules of Evidence. *See id.* That said, our conclusion that any error here did not cause reversible harm applies equally to Appellant's Rule 403 argument, and renders any forfeiture issue moot.

> It may be used to end trial proceedings when faced with error so prejudicial that "expenditure of further time and expense would be wasteful and futile." . . . The trial court is required to grant a motion for a mistrial only when the improper question is "clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors."

*Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003) (citations omitted) (quoting *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000)).

For all of the reasons that the alleged errors in points of error eleven through thirteen did not affect Appellant's substantial rights, we find no abuse of discretion in the trial judge's conclusion that a mistrial was unwarranted. Again, the testimony was lacking in detail, and the detail that *was* added served to cure the harm. We cannot say that, beyond any reasonable disagreement, Garcia's testimony was so "highly" and "clearly" prejudicial as to leave an indelible impression on the jurors' minds. The trial judge acted well within her discretion in proceeding as she did. Points of error eleven through fourteen are overruled.

## VIII — Points of Error Fifteen and Sixteen

In points of error fifteen and sixteen, Appellant argues that the trial judge erred when she allowed the prosecution to adduce evidence that, more than ten years before Appellant carried out the instant capital murder scheme, he abused—and ultimately tried to kill—his eldest daughter, Nasemah.

Over Appellant's relevance, Rule 403, and Rule 404(b) objections, the prosecution adduced the following guilt phase testimony:

- • Nesreen testified that Appellant told "[a]ll of the girls in the family" that if they got "a boyfriend or . . . married anybody" without his approval, he would "put a bullet between your eyes and the eyes of the person that you dishonored me with." Nesreen believed this threat was "real" because, when Nasemah did not abide by the rules Appellant set for his daughters, "He

drugged her and took her to Jordan and tried to kill her."

- Alrawbdeh testified that Nasemah left Appellant's home at age eighteen because "[s]he wanted to marry a guy and he wasn't approved" by Appellant. Appellant made it known "loud and clear" that, "If a girl runs away from home, that will bring disgrace to the family." When Nasemah returned home, Appellant took her to Jordan and returned without her. Appellant later told Alrawbdeh that, while in Jordan, "He had given [Nasemah] a lot of pain medication and he tried to drown her in the bathtub." And he told his other daughters that if they did what Nasemah did, "They will die."

Further, when the prosecution cross-examined Appellant, he responded negatively to the following questions:

Q.  And when you got [Nasemah] to Jordan, you took her to a hotel room, you drugged her, and you tried to drown her in a bathtub, didn't you, sir?

A.  That's not true.

Q.  You tried to drown her multiple times, correct, sir?

A.  That is a lie.

. . .

Q.  And the reason you couldn't kill your daughter is because in that effort to drown her, she got a big bruise on her head and it wouldn't look accidental, would it, sir?

A.  That is not true.

. . .

Q.  And you left your daughter to be a slave, correct?

A.  That's not true.

In point of error fifteen, Appellant alleges that the trial judge erroneously allowed the prosecution to adduce evidence of an extraneous attempted murder. His argument incorporates the evidentiary rules against irrelevant evidence, *see* TEX. R. EVID. 401, 402, propensity evidence, *see*

*id.* R. 404(b), and unfairly prejudicial evidence, *see id.* R. 403. In point of error sixteen, Appellant focuses on the allegation that Appellant left Nasemah in Jordan "to be a slave."

But as the State points out in its brief, the prosecution did not adduce evidence that Appellant left Nasemah in Jordan to be a slave until the punishment phase. In the guilt phase, the prosecution asked Appellant a question about Nasemah being left in Jordan as a slave, to which Appellant responded, "That's not true." A lawyer's questions can sometimes lead to evidence, but they are not themselves evidence. *See Madden v. State*, 242 S.W.3d 504, 515 n.30 (Tex. Crim. App. 2007) ("We have only [the] attorney's questions that assert such facts, but he was not a witness, and his questions are not evidence."). For that reason, any error alleged in point of error sixteen ultimately did not affect Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). We therefore focus our analysis on point of error fifteen.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). That said, "a court may exclude" otherwise admissible evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." *Id.* R. 403.

"One well-established rationale for admitting evidence of uncharged misconduct is to rebut a defensive issue that negates one of the elements of the offense." *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). "That is, 'a party may introduce evidence of other crimes, wrongs, or acts if such evidence logically serves to make more or less probable an elemental fact, an

evidentiary fact that inferentially leads to an elemental fact, or defensive evidence that undermines an elemental fact.'" *Id.* (quoting *Martin v. State*, 173 S.W.3d 463, 466 (Tex. Crim. App. 2005)). Further, the defendant's opening statement may open the door to the admission of extraneous offense evidence to rebut opening statement defensive theories. *Id.* at 344–45.

"[A] trial judge's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard." *Id.* at 343. "So, too, is a ruling on the balance between probative value and the counter factors set out in Rule 403, although that balance is always slanted toward admission, not exclusion, of otherwise relevant evidence." *Id.* This is so because we presume that probative value outweighs prejudicial value "unless in the posture of the particular case the trial court determines otherwise." *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g); *see also Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001) (Rule 403 "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."); *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992) (Rule 403 excludes "certain evidence if its probative value is *substantially* outweighed") (emphasis in original).

Accordingly, as long as the judge's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the ruling will be upheld. *Id.* at 343–44. Further, if the trial judge's ruling is correct on any applicable legal theory, the ruling will stand. *Id.* at 344.

As the trial judge astutely observed when overruling Appellant's objection before Nesreen was about to testify about what happened to Nasemah, Appellant's counsel "said in opening statement that these two killings were unrelated." Evidence that Appellant believed so strongly that his daughters' actions could impugn his "honor" that he was willing to commit—indeed, had

previously committed—violent acts to "clean his honor," would help to debunk that particular defensive theory. The trial judge, therefore, did not abuse her discretion to conclude that this evidence was relevant in ways that did not merely suggest that Appellant had a propensity for violence. *See* TEX. R. EVID. 401, 402, 404(b). Within the zone of reasonable disagreement, the trial judge could conclude that evidence of Appellant's mistreatment of Nasemah was admissible under Rules of Evidence 401, 402, and 404(b)(2).

Neither can we say that the trial judge erred under Rule 403 in her balancing of the evidence's probative value against its potential for misuse. In the extraneous conduct context, the "Rule 403 balancing test includes the following factors":

(1)    how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor which is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense;

(2)    the potential the other offense evidence has to impress the jury "in some irrational but nevertheless indelible way;"

(3)    the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense; and

(4)    the force of the proponent's need for this evidence to prove a fact of consequence, *i.e.*, does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute.

*De La Paz*, 279 S.W.3d at 348–49 (quoting *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000)).

Under this rubric, the trial judge could rationally conclude that this evidence was highly probative of Appellant's views about "honor"—and, ultimately, the link between the murders of Bagherzadeh and Coty. Further, given that the attack on Nasemah was supported by the testimony

of two witnesses, the trial judge could conclude that it was sufficiently supported to pass Rule 403 muster. And while allegations of family violence are serious, the State's case against Appellant included evidence that he stalked, harassed, threatened, and even planned to kill another of his daughters. We therefore perceive little risk in the jury being influenced by this evidence in an irrational, indelible way. Finally, the State took little time to develop this evidence, and especially given Appellant's suggestion in his opening statement that Bagherzadeh's and Coty's murders were unrelated, the trial judge could rationally conclude that the State's need for the evidence was substantial. Balancing these considerations, we regard the trial judge's Rule 403 ruling as falling squarely within the zone of reasonable disagreement.

Appellant additionally suggests that the trial judge "violated the prescribed procedure" for deciding whether this evidence was admissible over his objections. *See Montgomery*, 810 S.W.2d at 387 (describing "the trial court's function" in ruling on evidentiary objections). But *Montgomery* does not purport to set forth an exclusive, nondiscretionary procedure for trial judges to follow in deciding whether to admit evidence over an evidentiary objection. Further, procedural errors of this nature could only be reversibly harmful if they resulted in the admission of evidence that was (A) otherwise inadmissible and (B) harmful in its own right. As explained above, those conditions were not present here. Any procedural error on the trial judge's part therefore did not cause reversible harm. *See* TEX. R. APP. P. 44.2(b). Points of error fifteen and sixteen are overruled.

### IX — Points of Error Seventeen and Eighteen

In points of error seventeen and eighteen, Appellant contends that the trial judge erred when she allowed one of the State's witnesses to testify about statements that Appellant's son Nasim made during an out-of-court conversation about Bagherzadeh's murder.

During the guilt phase, the State asked Appellant's nephew, Ahmed Garcia, to discuss the "time when you and Nasim were together at" Appellant's house watching television. Garcia testified, "There was news about Miss Gelareh, about, you know, the reward that they had for anybody who has any information that leads to an arrest in her case." Garcia claimed that when the news story came on the television, Nasim laughed and asked Garcia, "Do you know who killed her?"

The trial judge summoned the parties to the bench and asked the State, "Is this the co-conspirator statement?" The State answered, "Yes, Judge. . . . This witness will say that Nasim told him that Nasim killed Gelareh and will go into the details of what he told him." The trial judge then remarked:

> Right. So I guess the State's co-conspirator is reliable because they admit that they did the shooting. So I would think that would be admissible. The question is reliability. *Now, if he had said [Appellant] had done the shooting, it might not be admissible, but it seems to me if he said I did the shooting, that makes it admissible.*

(Emphasis added).

Appellant objected "on the basis of hearsay," adding that, "under *Crawford*," he had "a right to cross-examine Nasim." *See Crawford v. Washington*, 541 U.S. 36, 59 (2004) (under the Confrontation Clause, "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine").

To that objection, the trial judge responded: "I think the law is pretty clear that *it's admissible if it's reliable. So when I do the balancing test, it seems to me it balances in favor of reliability*. So I'm going to admit it." (Emphasis added). After further discussion, the trial judge again asked the State, "You offering it as a statement of a co-conspirator?" The State again answered, "Yes, Judge,"

and the trial judge expressly overruled Appellant's objection.

Garcia proceeded to testify that:

A.      [Nasim] said: Do you know who killed her? I said: Who? He said: I am the one who did it. I was like: How did you do that? He said that him and his father and Shmou, they went to the area. So they -- obviously they were stalking her. And then they followed her to her home. And then after that, Nasim said that he had a ski mask on his head, he put it down, and he was like approaching the car and she was not aware of that. So –

. . .

A.      Okay. Nasim was walking towards the car. She was on the phone. And he said when he approached that she noticed him. When she noticed him, he was coming, so she looked at him and he fired the gun. I don't know how many bullets he shot. I don't know where he shot her. He said that when he shot her, she got kind of like -- I apologize about that. He said when he shot her, she got -- her foot got stuck on the pedal, the gas accelerator, she hit the wall in front of her. And exactly what he told me that the wheels was doing (indicating). That's what he told me.

. . .

Q.      Did Nasim tell you anything about the defendant at that time when Gelareh was killed?

A.      Yeah. He ran to his father's car. And, you know, I don't know where they met, I don't know where they were exactly, you know, what -- I mean, the general picture that he got back to the car, and -- you know, he asked -- his father asked him: Did you do it? And he said yes.

In point of error seventeen, Appellant posits that the trial judge's ruling violated the rule against hearsay. *See* TEX. R. EVID. 801, 802. He points out that, for an out-of-court statement to be admissible as a non-hearsay, co-conspirator's statement, the statement must have been "made . . . during and in furtherance of the conspiracy." *Id.* R. 801(e)(2)(E). Appellant argues that Nasim's out-of-court statements were not made "during and in furtherance of the conspiracy" to murder Bagherzadeh, so they constituted inadmissible hearsay.

The admissibility of an out-of-court statement over a hearsay objection is within the trial judge's discretion. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). Therefore, a reviewing court should not reverse the trial judge's ruling unless the trial judge abused her discretion. *Id.* A trial judge abuses her discretion only when her decision is so clearly wrong as to lie outside the zone of reasonable disagreement. *Id.*

One can fairly question whether, under Garcia's version of events, Nasim's statements were "made . . . during and in furtherance of" Appellant and Nasim's conspiracy to murder Bagherzadeh. *See* TEX. R. EVID. 801(e)(2)(E). Even if we answered that question in Appellant's favor, that would not end the analysis. "[I]f the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial judge gave the wrong reason for his right ruling." *De La Paz*, 279 S.W.3d at 344. Here, another legal theory supported the trial judge's ruling: the hearsay exception for statements against penal interest.

Under the Texas Rules of Evidence, an out-of-court statement may be admitted over an opponent's hearsay objection if:

(A)     a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, [the statement] . . . had so great a tendency to . . . expose the declarant to . . . criminal liability . . . ; and

(B)     [the statement] is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

TEX. R. EVID. 803(24).

The trial judge's remark that, "if [Nasim] had said [Appellant] had done the shooting, it might not be admissible, but it seems to be if [Nasim] said I did the shooting, that makes it

admissible," shows that the trial judge recognized the self-incriminating nature of Nasim's statements. *See Walter v. State*, 267 S.W.3d 883, 886 (Tex. Crim. App. 2008) ("only those statements that are directly against the speaker's penal interest (including 'blame-sharing' statements) are admissible under Rule 803(24)."). The trial judge would not have abused her discretion to conclude that Nasim would only have made those statements because he believed them to be true, as they strongly tended to expose him to criminal liability. *See* TEX. R. EVID. 803(24)(A).

Neither would the trial judge have abused her discretion to conclude that Nasim's statements were "supported by corroborating circumstances that clearly indicate[d] [their] trustworthiness." *See id.* R. 803(24)(B). The trial judge expressly stated that her own "balancing" of the evidence led her to rule "in favor of reliability"—and thus admissibility. And based on the evidence adduced at trial, the trial judge's balancing was squarely within the zone of reasonable disagreement.

In determining whether a possible statement against interest is sufficiently corroborated under Rule of Evidence 803(24), the "trial court should consider a number of factors":

> (1) whether guilt of declarant is inconsistent with guilt of the defendant, (2) whether declarant was so situated that he might have committed the crime, (3) the timing of the declaration, (4) the spontaneity of the declaration, (5) the relationship between the declarant and the party to whom the statement is made, and (6) the existence of independent corroborative facts.

*Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999).

Applying this rubric, we note that Nasim's guilt was not incompatible with Appellant's. Indeed, the evidence showed that the two worked in concert in murdering Bagherzadeh. In addition, Alrawbdeh corroborated that Nasim was so situated that he might have committed the crime—Alrawbdeh claimed to have watched as Nasim exited Appellant's car and shot Bagherzadeh. The timing, spontaneity, and setting of Nasim's out-of-court statement did not suggest coercion,

duress, or pressure. We further note the familial relationship between Nasim and Garcia. Finally, the trial judge might rationally have noted the existence of several independent pieces of evidence corroborating Nasim's account. To take but one example, Nasim mentioned Appellant's car being pulled over the night of Bagherzadeh's murder. And the State adduced evidence—a record of a traffic stop—corroborating this aspect of Nasim's out-of-court statement. For these and other reasons, the trial judge would not have abused her discretion to admit Nasim's out-of-court statement as a statement against interest. *See* TEX. R. EVID. 803(24).

In point of error eighteen, Appellant invokes the Confrontation Clause, arguing that Nasim's out-of-court statement amounted to "testimony" that he had no opportunity to cross-examine. The Sixth Amendment's Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. CONST. amend. VI. This Clause "bars the admission at trial of an absent witness's statements—however trustworthy a judge might think them—unless the witness is unavailable and the defendant had a prior chance to subject her to cross-examination." *Smith v. Arizona*, 602 U.S. 779, 784 (2024).

But "the Clause confines itself to 'testimonial statements.'" *Id.* So if the State elicits an out-of-court statement that is "non-testimonial in nature," the Clause gives way, posing no standalone impediment to admissibility. *See Woods v. State*, 152 S.W.3d 105, 114 (Tex. Crim. App. 2004). And, as relevant here, the United States Supreme Court has remarked that, "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. Indeed, we have noted that "casual remarks . . . spontaneously made to acquaintances" do not "fall within the categories of testimonial evidence" covered by the Confrontation Clause. *Woods*, 152 S.W.3d at 114.

Under this rubric, and within the zone of reasonable disagreement, Nasim's admissions to Garcia were "non-testimonial in nature." *See id.* They fit neatly within *Crawford* and *Woods*'s descriptions of "a casual remark to an acquaintance." *See Crawford*, 541 U.S. at 51; *Woods*, 152 S.W.3d at 114. Certainly, they did not carry the "solemn[ity]" typically associated with "*ex parte* in-court testimony or its functional equivalent." *See Crawford*, 541 U.S. at 51. On this record, we cannot say that the trial judge abused her discretion in admitting Nasim's out-of-court statements over Appellant's confrontation objection. *See, e.g.*, *Coble v. State*, 330 S.W.3d 253, 289–90 (Tex. Crim. App. 2010) (applying the abuse of discretion standard to a confrontation complaint). Points of error seventeen and eighteen are overruled.

## X — Point of Error Nineteen

In point of error nineteen, Appellant contends that the trial judge abused her discretion when, after sustaining Appellant's objections to certain "did you know" questions from the State, she denied Appellant's request for an instruction to disregard those questions.

At the guilt phase, Appellant called as a witness Omar Obaid, a longtime acquaintance of his. Obaid testified that: (1) he and his family used to visit the Irsan family at the Irsans' house; (2) he knew and often spoke to Nadia and Nesreen; and (3) Nadia and Nesreen would play with his children whenever they visited.

The State apparently interpreted Obaid's testimony as a subtle attempt to establish Appellant's good character, so, on cross-examination, the State asked Obaid a series of "did you know" questions designed to test (what the State took to be) Obaid's opinion of Appellant's character. *See* TEX. R. EVID. 405(a)(1) ("When evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form

of an opinion."). Those questions were:

- "Did you know about the defendant making statements and saying that he took Nasemah back to Jordan and tried to kill her by drowning her?"

- "Did you know that he made those statements to numerous people, that he tried to kill his own daughter?"

- "Did you know that he then had a list of people that he wanted to kill?"

Appellant objected to the second and third of these questions, explaining that he had not raised character as an issue, so the prosecutor could not ask "have-you-heard" and "did-you-know" questions. Each time, the trial judge sustained Appellant's objection but denied his follow-up request for an instruction to disregard the question.

On appeal, Appellant complains that these questions improperly impugned his character. *See* TEX. R. EVID. 404 ("Evidence of a person's character or character trait is not admissible"). He continues, "Sometimes, merely asking a question imparts highly prejudicial information." Appellant concludes, therefore, the trial judge should have instructed the jury to disregard the State's "did-you-know" questions.

Appellant did not object to the first question and did not ask the trial judge to instruct the jury to disregard it. Therefore, he has forfeited his ability to complain about that question on appeal. *See* TEX. R. APP. P. 33.1. And Appellant offers no argument as to how the third question improperly impugned his character or was otherwise irrelevant to Appellant's guilt of capital murder.

That leaves only the second question for us to consider: "Did you know that [Appellant] made . . . statements to numerous people, that he tried to kill his own daughter?" Here, any error did not affect Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). As we have explained, Nesreen and Alrawbdeh properly testified that Appellant tried to kill Nasemah. *See supra* point of error

fifteen. Even if the question at issue "impart[ed] . . . information" about what Appellant did (or tried to do) to Nasemah, it did not impart any new information. Point of error nineteen is overruled.

### XI — Point of Error Twenty

In point of error twenty, Appellant argues that the trial judge erred when she allowed the State to introduce evidence that, before murdering Bagherzadeh and Coty, Appellant traded "[d]rugs for guns."

Multiple witnesses testified that Appellant purchased firearms (.22- and .38-caliber handguns) from a neighborhood acquaintance in exchange for prescription painkillers. Appellant obtained a running objection to these lines of testimony, arguing that they were irrelevant, unfairly prejudicial, and outside the scope of permissible extraneous offense evidence. *See* TEX. R. EVID. 401–403, 404(b). The trial judge overruled Appellant's objections, observing that the evidence "show[ed] that [Appellant] wanted the guns so bad he was willing to deliver a controlled substance to get them."

On appeal, Appellant concedes that the fact that Appellant acquired firearms "may be relevant to proving capital murder involving deaths by firearms." But he contends that the illicit manner in which he acquired the firearms was irrelevant, violated the rule against propensity-for-wrongdoing evidence, and was unfairly prejudicial. *See* TEX. R. EVID. 401–403, 404(b).

As mentioned, "a trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard." *De La Paz*, 279 S.W.3d at 343. "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *Id.* at 343–44. If the trial judge's ruling is correct on any applicable

legal theory, the ruling will stand. *Id.* at 344.

In this case, as the trial judge astutely observed, the "drugs for guns" evidence "show[ed] that [Appellant] wanted the guns so bad he was willing to deliver a controlled substance to get them." This evidence was therefore probative of Appellant's motive and intent. *See* TEX. R. EVID. 404(b)(2). The evidence also suggested that Appellant planned his conduct and prepared for it—that it was not carried out on a whim. *See id.* Appellant's relevance and Rule 404(b) arguments therefore have no merit.

As for Appellant's Rule 403 argument, we find no abuse of discretion in the trial judge's ruling. As discussed, the evidence supported an inference that Appellant's conduct was planned and prepared for. Further, given the other evidence showing how Appellant ultimately used these guns, the trial judge could rationally perceive that there was little risk of the jury placing undue emphasis on the fact that he acquired them with "drugs." Finally, the evidence did not take an inordinate amount of time to develop. Within the zone of reasonable disagreement, the trial judge could conclude that this evidence's probative value was not substantially outweighed by its capacity for misuse. *See id.* R. 403. Point of error twenty is overruled.

### XII — Point of Error Twenty-One

In point of error twenty-one, Appellant contends that the trial judge erred when, after the State revealed in one of its questions that Appellant had participated in "jail calls," she overruled Appellant's request for an instruction to disregard the State's question.

Appellant called his son, C.I., to testify at the guilt phase. While cross-examining C.I., the State directed C.I.'s attention to "December 7th of 2014, at 2:45 p.m.," and asked C.I., "Do you recall having conversations with [Appellant] on the phone?" When C.I. answered negatively, the

State continued:

> Q.     Okay. Yet, you are recorded on the phone. Do you recall -- do you know that the jail calls are all recorded, sir?
>
> A.     Yes, I do.
>
> Q.     So you know that there is a recording of every time you talk to your father on the phone?

Approaching the bench, Appellant's counsel objected that the State's reference to "jail calls" undermined Appellant's presumption of innocence and right to a fair trial because "[t]he jury now knows that he is in jail." The trial judge sustained counsel's objection and told the State, "Don't mention the jail anymore." Counsel then asked the trial judge for an instruction to disregard. The trial judge denied counsel's request.

On appeal, Appellant argues that "[d]isclosing to the jury that the defendant is incarcerated violates a defendant's right to the presumption of innocence." Primarily, Appellant cites *Estelle v. Williams*, in which the United States Supreme Court held that "the State cannot, consistently with [the right to a fair trial and its presumption of innocence under] the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes." 425 U.S. 501, 512–13 (1976). He then cites a string of cases addressing various permutations of "prison clothing." *See Randle v. State*, 826 S.W.2d 943, 944 (Tex. Crim. App. 1992) ("jail-issued clothing"); *Scott v. State*, 80 S.W.3d 306, 308 (Tex. App.—Fort Worth 2002, no pet.) ("marked orange overalls"); *Mendoza v. State*, 1 S.W.3d 829, 830 (Tex. App.—Corpus Christi–Edinburg 1999, pet. ref'd) ("restrained by shackles"); *Oliver v. State*, 999 S.W.2d 596, 598–99 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("jail clothes").

But none of these cases holds that, if the jury learns that the defendant at some point went

to jail on the alleged offense and at some point participated in a "jail call," the trial court has no choice but to instruct the jury to disregard that information. And that, ultimately, is the most that Appellant's jury could have gleaned from the State's question. The State's question referred to a date and time in December 2014; Appellant's trial took place in July 2018. Appellant's trial objection framed the facts differently ("The jury now knows that he is in jail"). But the record shows that Appellant's jury learned only a fact that is routinely and uncontroversially discussed in criminal trials across the country: after the defendant was arrested on suspicion of committing an offense, he was taken to jail.

Here, the trial judge in her discretion determined that it would be best for the State to discontinue using the word "jail" in subsequent questions. But Appellant has cited no authority that she was bound to do so, and we are unaware of any such authority in any event. The trial judge's admonition to the State is therefore better viewed as a concern over repeated references to Appellant having been incarcerated—not as a judicial determination that an isolated mention of "jail calls" irreparably tainted the jury.

Viewing the trial judge's ruling in this light, we conclude that while Appellant's requested instruction for the jury to disregard the State's question would have been helpful, it was not error for the trial court to refuse it. Point of error twenty-one is overruled.

### XIII — Point of Error Twenty-Two

In point of error twenty-two, Appellant posits that the trial judge abused her discretion when, in the trial's guilt phase, she "allow[ed] the prosecutor to bring in a highly prejudicial extraneous offense": that Appellant directed two of his sons to smuggle a controlled substance into a correctional facility.

At the guilt phase, Appellant called his son, A.I., to the witness stand. On direct examination, A.I. admitted that he had been arrested for, charged with, and "placed on probation" for, an offense he called "prohibited substance in a corrections facility." *See* TEX. PENAL CODE Ann. § 38.11 (titled "Prohibited Substances and Items in Correctional . . . Facility"). He also conceded that he had violated the terms of his probation and received a five-year prison sentence. It was later revealed that A.I. had committed this offense with his older brother, Nasim.

During A.I.'s cross-examination, the State informed the trial judge that it intended to "get into the fact that" A.I. and Nasim had committed this offense because "[their] father asked them to." Appellant objected, "It's an extraneous offense and irrelevant to the murder case. And if relevant, the prejudicial value outweighs probative." But the trial judge was unconvinced:

> I would have thought at the beginning of the trial that would not come in, but, you know, how the father controls them is pretty significant and an important factor in this case. So I find it to be highly probative. I think it finally outweighs the prejudicial value. So I find it's admissible.

The trial judge granted Appellant a running objection to this line of questioning.

As a result of the trial judge's ruling, the following exchange took place during A.I.'s cross-examination:

> Q.     You and your brother went to great lengths to open up a candy bar, put a Duragesic patch inside, wrap the candy bar back up, and smuggle it to your father in the correctional facility, didn't you?
>
> A.     Again, I pled guilty to that, yes.
>
>  . . .
>
> Q.     And that was something -- that was a wish that your father had, correct?
>
> A.     One of many, yes.

Q. And a wish that you followed through with and got charged with a felony for that, correct?

A. I'm going to say no to following through. Again, context.

Q. Sir, the candy bar with the Duragesic patch was found inside the correctional facility, correct?

A. Correct.

On appeal, Appellant asserts that this evidence was irrelevant to Appellant's capital murder charge, violated the general rule against "propensity" evidence, and was unfairly prejudicial because "it showed primarily that appellant is a criminal generally." *See* TEX. R. EVID. 401–403, 404(b).

We begin with Appellant's relevance and propensity arguments. The trial judge reasoned that Appellant's involvement in this extraneous offense was relevant to the charged offense because his control over his children had become "pretty significant and an important factor in this case." We agree. The trial judge did not abuse her discretion to conclude that, if only by a nudge, the drug smuggling offense tended to show the lengths to which Appellant's family members would go to appease him. *See Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) ("Evidence does not need to prove or disprove a particular fact by itself to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving a fact of consequence."). This character-neutral inference remains true even if the evidence might also have evinced some of Appellant's negative character traits. *See Montgomery*, 810 S.W.2d at 387 (observing that extraneous offense evidence "'may . . . be admissible' if it has relevance *apart from* its tendency 'to prove'" character conformity) (emphasis in original).

That brings us to Appellant's Rule 403 theory of inadmissibility. Although this theory presents a closer call, ultimately, we do not view the trial judge's ruling as falling outside the zone

of reasonable disagreement. *See De La Paz*, 279 S.W.3d at 343, 348–49 (observing that Rule 403 favors the "admission, not exclusion, of otherwise relevant evidence," and laying out the considerations pertinent to a Rule 403 analysis). The trial judge described this evidence as "highly probative," and given the active roles Appellant's family members played in the underlying murders, it is hard to disagree with her description. The State's need for the evidence was therefore nontrivial. The evidence also took little time to develop. *See id.* Finally, given the facial dissimilarity between the charged offense and the extraneous offense at issue here, we see little risk of the jury deciding this case on an improper basis, getting confused or distracted, or affording the evidence undue weight in its deliberations, and the evidence was not redundant of other evidence. *See Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (summarizing factors to consider when undertaking a Rule 403 analysis). The trial judge did not abuse her discretion in allowing this evidence. Point of error twenty-two is overruled.

## XIV — Points of Error Twenty-Three and Twenty-Four

In points of error twenty-three and twenty-four, Appellant argues that the trial judge committed reversible error when she overruled his objections to certain questions the State asked about Appellant's disciplinary methods.

C.I., one of Appellant's sons, testified at the guilt phase. On cross-examination, the State asked C.I. whether his half-sister Nadia ever "disciplined" Appellant's younger children. C.I. responded, "From time to time." On redirect, Appellant asked C.I. whether Nesreen had also disciplined the Irsan children. When C.I. confirmed that she had, Appellant asked C.I. how Nesreen disciplined the children. C.I. stated that when Nesreen got upset "she would grab whatever was closest to her and throw it at you." C.I. also described Nesreen as a "violent" person who had "mood

swings."

On recross, the State began to ask C.I. questions about how Appellant disciplined his children:

> Q.      And your dad would smack whoever with a cane over the head whenever –

Appellant immediately objected "to going into extraneous offenses through this examination," but the trial court overruled the objection, finding that "the door was opened." The State continued its line of questioning:

> Q.      Your dad used to strike whoever in the head or wherever he could with a cane when he got mad?
>
> A.      Incorrect.
>
> Q.      Your dad would tie people to a board and then proceed to beat them?
>
> A.      Also incorrect.

Appellant sought a running objection, which was overruled by the trial court. Nevertheless, Appellant persisted and objected to the entire line of questioning, believing that he had not "opened the door." Instead, Appellant pointed out that the State, not he, had initially raised the issue of discipline in the Irsan household. The trial court restated its finding that the door was opened, after which Appellant put on the record his objection that questions about Appellant's disciplinary methods: (1) constituted "extraneous offense questions," (2) were irrelevant, and (3) would elicit testimony for which the "probative value [would be] outweighed by prejudicial value." The trial judge again overruled Appellant's objection.

The State resumed its questioning:

> Q.      (by [Prosecutor])      Going back to your father's discipline, tied to a board and beat you, correct?

A.      Incorrect.

Q.      And your sister, Nada, in fact, he struck her with a cane as well to discipline your sister, correct?

A.      Incorrect.

Q.      Do you agree with me that striking children with a cane is an unorthodox form of discipline?

A.      I would say so.

Q.      Would you say that tying your child to a board and then beating them is an unorthodox form of discipline?

A.      I would say so.

Q.      Would you say beating your child with cerebral palsy with a cane is an unorthodox form of discipline?

A.      I would say so.

On appeal, Appellant argues that the trial judge's ruling allowed the State to "insinuat[e]" that he "disciplined his children in an especially cruel fashion." Appellant describes this insinuation as "highly prejudicial with very little probative value of any issue during the guilt stage of trial." *See* TEX. R. EVID. 403. Appellant argues that even if defense counsel "opened the door to discipline in appellant's home, the trial court had a responsibility to control the evidence, and not permit such highly inflammatory, prejudicial evidence be heard by the jury." *See* TEX. R. EVID. 403. In point of error twenty-three, Appellant complains about the implication that he tied his children to a board and beat them. In point of error twenty-four, Appellant specifically complains about the implication that he caned Nada.

Even if we assume for argument's sake that the testimony the State sought to elicit would have been objectionable, any error here did not affect his substantial rights. *See* TEX. R. APP. P.

44.2(b). Appellant's brief repeatedly suggests that the trial judge's ruling led to the introduction of prejudicial and inflammatory "evidence." But he is mistaken. Again, questions can sometimes lead to evidence, but "questions are not evidence." *Madden*, 242 S.W.3d at 515 n.30. And C.I. firmly denied that Appellant engaged in the conduct described in the State's questions.

To the extent the State's questions insinuated the existence of extraneous bad act evidence, we note that the evidence of Appellant's active role in the underlying murders was strong. So the fact that the State asked suggestive questions about Appellant's disciplinary methods—which the witness promptly brushed aside—would have had a minimal effect, if any, on the jury's deliberations. *See Gonzalez*, 544 S.W.3d at 373 (when applying Texas Rule of Appellate Procedure 44.2(b), "If we have a fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect, we will not overturn the conviction."). Points of error twenty-three and twenty-four are overruled.

## XV — Point of Error Twenty-Five

In point of error twenty-five, Appellant argues that the trial judge erred to deny his request for a mistrial after a witness testified to an event that Appellant regarded as irrelevant.

FBI Special Agent Carlos Acosta testified about one of the searches of Appellant's property. At one point, the following exchange took place:

Q.      . . . why did you want [Nesreen] at the location [of the search]?

A.      To help me locate any hidden compartments that maybe we overlooked.

Q.      And when you took Nesreen Irsan out to the [location of the search], did you take any precautions with her identity when you took her out there?

A.      I did. Specifically -- because prior to bringing Nesreen Irsan to the property, shots had been fired at FBI while we were doing the search, at least three

shots.

After summoning the parties to the bench, the trial judge asked the State to explain the relevance of Acosta's answer. The State responded, "It is not relevant[.]" The State claimed that it had instructed Acosta not to reveal that someone had shot at FBI agents during the search in question. The trial judge admonished Acosta to "[j]ust listen to the question asked and answer that question," and Acosta agreed to do so. When testimony resumed, the trial judge addressed the jury directly: "Members of the jury, you should disregard the last answer of this witness and consider it for no purpose." The trial judge then denied Appellant's motion for a mistrial.

On appeal, Appellant casts the trial judge's mistrial ruling as an abuse of discretion, arguing that Acosta's testimony was incurable. *See Wood*, 18 S.W.3d at 648 ("Mistrial is a remedy appropriate for a narrow class of highly prejudicial and incurable errors[.]"). We disagree. On further examination, Acosta made it clear that Appellant could not have been the shooter:

> Q. Okay. And at this time, at the beginning of the search warrants, was Ali Irsan arrested at that time?
>
> A. Yes. Before the search warrants, Ali Irsan was under arrest.
>
> Q. All right. And so when you are out there with Nesreen, was Mr. Irsan currently in custody?
>
> A. Yes, Mr. Irsan was in custody.

To grant relief on this point, we would have to conclude that, beyond any reasonable disagreement, Appellant's jury was so inflamed by the knowledge that someone other than Appellant fired shots at FBI agents that it simply could not set that fact aside and focus on the evidence germane to Appellant himself. We do not have such a dim view of this jury. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) ("Instructions to the jury are generally considered

sufficient to cure improprieties that occur during trial. And we generally presume that a jury will follow the judge's instructions."). Further, the State presented ample evidence of Appellant's guilt of the charged offense. We therefore perceive little danger that the jury went down rabbit trails that were irrelevant to the issues before it. *See Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992) ("[It] is well-settled that [improper] testimony . . . can be rendered harmless by an instruction to disregard by the trial judge, unless it appears the evidence was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind."). Point of error twenty-five is overruled.

### XVI — Point of Error Twenty-Six

In point of error twenty-six, Appellant argues that the trial judge committed reversible error when she denied Appellant's request for a mistrial after a witness testified to an out-of-court statement that Appellant regarded as hearsay.

The State called Coty's twin brother Cory to testify at the guilt phase. Cory was not an eyewitness to Bagherzadeh's or Coty's murders, but he was able to describe Coty and Nesreen's relationship, his own relationship with Bagherzadeh, and an extended phone conversation he had with Appellant. As relevant here, Cory also testified about a tense exchange occurring before Coty's murder between Coty, Nadia, and Nesreen. According to Cory, near the end of the exchange, Nadia made an unsettling remark:

A. Nesreen handed [Nadia] the keys to the car and said: If you want to go home, here are your keys, you can take yourself.

Q. How did Nadia react to that?

A. She got really angry. And I don't remember what it was that she said. And then Coty jumped in front of her and was saying: Why don't you just leave

us alone and let us be. And she said: I can't wait till my dad puts a bullet in your head.

The trial judge sustained Appellant's hearsay objection and instructed the jury to "disregard the last answer of the witness and consider it for no purpose." Appellant then moved for a mistrial, which the trial judge denied.

Appellant argues that Cory's testimony necessitated a mistrial because of the similarity between Nadia's threat and the indicted offense. But considering the context of Nadia's statement (in the midst of a contentious disagreement, directed toward a person appearing to stand up to her), it would not be difficult for the jury to set it aside as something said in the heat of the moment. More importantly, the jury eventually learned, over no objection from Appellant, that this was not the first time Nadia had threatened Coty:

> Q.  Okay. [Without repeating what Nadia] said, . . . how did you react to what she said?
>
> A.  It was just shocking that she was that detailed.
>
> . . .
>
> Q.  Okay. Could you see Coty – not what he said, but his reaction to Nadia's statement?
>
> A.  I think she had threatened him more in their presence, so he was probably more used to it than I was.

Knowing that the "bullet in your head" remark was but one example of an unspecified number of threats, it would not have been difficult for the jury to disregard the remark altogether. Far more damaging to Appellant was Nesreen's testimony, properly admitted over Appellant's objection, that Appellant himself threatened to "put a bullet between [her] eyes and the eyes of the person that [she] dishonored [him] with." In any event, within the zone of reasonable disagreement,

the trial judge could rationally conclude that Cory's testimony was not "so clearly calculated to inflame the minds of the jury or . . . of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind." *See Kemp*, 846 S.W.2d at 308. Point of error twenty-six is overruled.

### XVII — Points of Error Twenty-Seven Through Twenty-Nine

In points of error twenty-seven through twenty-nine, Appellant argues that the trial judge mishandled an incident in which, in the middle of trial, a handful of jurors informed the bailiff that they had seen Appellant engage in inappropriate courtroom behavior.

After a full day of testimony near the end of the guilt phase, the bailiff informed the trial judge in open court and outside the jury's presence about an incident that occurred as the jury was leaving for the day. Specifically, four jurors "pulled [the bailiff] aside" and told him that they needed to bring something to his attention. The bailiff admonished them to "say nothing to me together." The jurors therefore agreed to speak to the bailiff one at a time.

The four jurors told the bailiff that they saw Appellant give a look to the prosecutor during cross-examination of a witness, leading them to be "concerned for the safety of the prosecutor." The bailiff informed the trial court on the record:

| | |
|---|---|
| THE COURT: | All right. Let's take the first one. What did that person say about security or the prosecutor's safety? |
| . . . | |
| THE BAIFLIFF: | She said she had never seen the look of that nastiness ever before. And as she was talking, he gave her a look and made a snapping finger as if he is breaking something, and she was scared. |
| THE COURT: | Okay. She was scared for the prosecutor? |

THE BAILIFF:  That's the way I'm understanding it. I'm not sure if it's she scared for her or prosecutor, but she –

THE COURT:  Okay. And did the second juror express a concern about the prosecutor's safety?

THE BAIFLIFF:  The second one said basically the same thing, except she just saw him just giving a dirty look and snapping.

THE COURT:  So nothing about safety?

THE BAILIFF:  No.

THE COURT:  The third juror?

THE BAIFLIFF:  He said -- I don't know, but it came to his concern and he was concerned and he felt like he needed to tell me.

THE COURT:  Okay. And the fourth juror.

THE BAIFLIFF:  The fourth one just said: I'm probably going to be telling you the same thing that everybody else saw. And I said: That's okay on that. She made a gesture.

When the bailiff finished relaying this information, Appellant moved for a mistrial, claiming that "those four jurors [could not] be fair to the defendant from here on out and give us a fair verdict." The trial judge denied Appellant's request. The next morning, Appellant raised the issue again, asking the trial judge to "bring the four jurors out individually and . . . question them as to whether they think they can still be fair and impartial in this case based on what they saw, and also ask them if they discussed it with any other jurors." The trial judge denied this request, as well, explaining, "the fact that they told the bailiff each privately, I think would indicate everybody's being very careful about doing the right things in this case."

In points of error twenty-seven and twenty-eight, Appellant claims that the trial judge erred when she refused to question the four jurors about what they saw. In point of error twenty-nine,

Appellant argues that the trial judge should have granted his motion for a mistrial.

We have never squarely addressed the standard of review to be used when, after the defendant engages in inappropriate courtroom behavior, the defendant asks the trial judge to inquire into the jurors' ability to remain fair and impartial. But in cases presenting possible juror misconduct (as opposed to possible litigant misconduct), we have said that "examination . . . of jurors accused of misconduct" is "permitted but not required." *Granados v. State*, 85 S.W.3d 217, 236 (Tex. Crim. App. 2002). And in another context, the United States Supreme Court has said that "trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Illinois v. Allen*, 397 U.S. 337, 343 (1970).

These and other considerations lead us to conclude that, when a defendant engages in courtroom conduct that might undermine the jury's ability to render a fair verdict, the trial judge's decision whether to question the affected jurors should be reviewed only for an abuse of discretion. *Cf. Kelly v. State*, 60 S.W.3d 299, 304 (Tex. App.—Dallas 2001, no pet.) (applying the abuse of discretion standard to a claim that, after the defendant made a throat-slashing gesture at one of the jurors, the trial judge should have inquired into the juror's ability to remain impartial).

Meanwhile, a trial court's ruling on a motion for mistrial should be reviewed only for an abuse of discretion. *Coble*, 330 S.W.3d at 292. Therefore, to resolve points of error twenty-seven through twenty-nine, we need only decide whether the trial judge abused her discretion in proceeding as she did.

We conclude that she did not. It is not uncommon for defendants to express frustration at questions or answers with which they take umbrage. Were we to hold that outbursts borne out of frustration or anger always call for a mistrial or an examination of the jurors, even when the trial

judge in her discretion concludes otherwise, we would create an incentive for litigants to profit from their own misbehavior. We have declined to create that kind of incentive before, and we decline to do so now. *See Chamberlain v. State*, 453 S.W.2d 490, 492–93 (Tex. Crim. App. 1970) (overruling a contention that the trial judge should have granted a mistrial after the defendant "got into a scuffle" with the courtroom deputies because granting relief under those circumstances "would permit a defendant to take advantage of his own misconduct, and the attempted administration of justice would be reduced to a mockery").

Here, the trial judge concluded that Appellant's conduct was not "so prejudicial that expenditure of further time and expense would be wasteful and futile." *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). Considering the care with which the jurors brought Appellant's conduct to the bailiff's attention, the judge also decided against interrupting the trial to interrogate a subset of jurors, at Appellant's request, about a disruption that Appellant himself caused. Given the record in this case, the incentives at play, and the trial judge's on-the-record reasoning as to why she proceeded as she did, we find no abuse of discretion in the trial judge's decisionmaking. Points of error twenty-seven through twenty-nine are overruled.

## XVIII — Point of Error Thirty

In his thirtieth point of error, Appellant submits that the phrase "same scheme or course of conduct," as used in Penal Code Section 19.03(a)(7)(B), is unconstitutionally vague. *See Johnson v. United States*, 576 U.S. 591, 595 (2015) (noting that prosecution under "a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement," violates due process). He presents this as an "as applied" challenge to the constitutionality of the capital murder statute.

In an as-applied challenge, the claimant "concedes the general constitutionality of the statute, but asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). Because such an assertion "requires a recourse to evidence, it cannot be properly raised by a pretrial motion to quash the charging instrument." *Id.* (quoting *Gillenwaters v. State*, 205 S.W.2d 534, 536 n.4 (Tex. Crim. App. 2006)).

Here, Appellant claims that he preserved an as-applied challenge to the constitutionality of Penal Code Section 19.03(a)(7)(B), but his only constitutional challenge to that statute came via a pretrial "Motion to Quash the Indictment." Clearly, that motion did not rely on evidence adduced at Appellant's trial. Rather, the motion argued that the statutory language itself "is vague and fails to provide fair notice to an individual that his alleged activity is proscribed by section 19.03(a)(7)(B)." And although Appellant obtained an adverse ruling on this motion, he did not reurge it after the State complied with the trial judge's directive to provide Appellant with some notice as to how it intended "to link these two [murders] together." *See supra* points of error three through six.

As a result, Appellant procedurally defaulted his contention that Penal Code Section 19.03(a)(7)(B) is unconstitutional "as applied to his particular facts and circumstances." *See Lykos*, 330 S.W.3d at 910. At most, Appellant preserved a claim that Section 19.03(a)(7)(B) is unconstitutional on its face, but that is not the nature of Appellant's claim on appeal.

In any event, such a claim would be meritless. In *Corwin*, we rejected the theory that the phrase "same scheme or course of conduct" was unconstitutionally vague "as it applie[d] to [the defendant's] own specific conduct." *See Corwin v. State*, 870 S.W.2d 23, 27 (Tex. Crim. App.

1993); *see also Corwin v. Johnson*, 150 F.3d 467, 475–76 (5th Cir. 1998) ("We are satisfied that § 19.03(a)(7)(B) has such a common-sense core of meaning that juries are able to comprehend.").[9]

Point of error thirty is overruled.

## XIX — Conclusion

We affirm the trial court's judgment of conviction and sentence of death.

Delivered: February 26, 2025
Publish

---

[9] It is true that in *Corwin* we reached the merits of the theory even though it was initially raised in a "pretrial motion to dismiss the indictment." *See id.* at 26. But *Corwin* predated much of the caselaw in which we articulated the proper way to preserve an as-applied challenge to the constitutionality of a statute. *See Lykos*, 330 S.W.3d at 910; *Gillenwaters*, 205 S.W.3d at 538 (holding that "appellant's motion for new trial was sufficient . . . to preserve for appellate consideration his 'unconstitutionally vague as applied' challenge to" a penal statute).